57 F.3d 224
 George MARBLEY; Katie McClain; and Ellen Beauregard, on
behalf of themselves and all others similarly
situated, Plaintiffs-Appellants,
v.
Mary Jo BANE, Individually and as Commissioner of the New
York State Department of Social Services; James P.
McCaffrey, as Commissioner of the Albany County Department
of Social Services; and Ora Langdon, as Commissioner of
the Franklin County Department of Social Services, on behalf
of themselves and all other county commissioners of Social
Services Districts within the State of New York, Defendants-Appellees.
 No. 1029, Docket 94-7822.
 United States Court of Appeals, Second Circuit.
 Argued Jan. 17, 1995.
Decided June 15, 1995.
 
 Gerald A. Norlander, Albany, NY (B. Robert Piller, Charles J. Brennan, Public Utility Project of New York, Inc., of counsel), for plaintiffs-appellants.
 Frank K. Walsh, Asst. Atty. Gen., Albany, NY (G. Oliver Koppell, Atty. Gen., Peter H. Schiff, Deputy Sol. Gen., Peter G. Crary, Asst. Atty. Gen., of counsel), for defendants-appellees.
 Before: WALKER, JACOBS, and CALABRESI, Circuit Judges.
 JACOBS, Circuit Judge:
 
 
 1
 The plaintiffs represent a class of New Yorkers living in federally-subsidized housing who seek an allotment (or a greater allotment) from funds block-granted by the federal government to the State of New York to subsidize the heating costs of low-income individuals. The named defendants are Mary Jo Bane, sued individually and as the Commissioner of the New York State Department of Social Services (the "Department"), and the county social services commissioners of Albany County and Franklin County. Plaintiffs George Marbley, Katie McClain, and Ellen Beauregard allege that the defendants' administration of New York's Home Energy Assistance Program ("HEAP"), violated (a) the Low-Income Home Energy Assistance Act of 1981 ("LIHEAA"), see 42 U.S.C. Secs. 8621-8629, which is the federal statute that authorizes funds for HEAP, and (b) the United States Constitution. The complaint seeks declaratory and injunctive relief, and money damages. The plaintiffs have been certified as class representatives of persons who have been excluded from HEAP, or given a lesser subsidy, allegedly in violation of federal law. The two defendant county commissioners have been certified (on plaintiffs' motion) as class representatives of all the county commissioners of social services in the State, on the ground that the commissioners as a group are charged with implementing a state regulation, policy or practice that is challenged as unlawful. No appeal is taken from the certification of the plaintiff and defendant classes.
 
 
 2
 Both parties cross-moved for summary judgment. The United States District Court for the Northern District of New York (McAvoy, C.J.) granted each party partial summary judgment. By then, the State had altered its position in part. Subsequently, on motion of the defendants pursuant to Fed.R.Civ.P. 60, the district court modified the prior order and dismissed the remaining claims on Eleventh Amendment grounds. In addition, the district court rejected plaintiffs' application for attorney's fees. In all but one respect, we affirm; we vacate the part of the order that rejects plaintiffs' application for attorney's fees, and remand for further proceedings on that issue.
 
 Background
 
 3
 The low-income heating assistance program at issue was originally part of the Crude Oil Windfall Profit Tax Act of 1980. Pub.L. No. 96-233, 94 Stat. 288 et seq. This program was designed to mitigate the effects on poor people of the increased costs of oil-based energy imposed by the OPEC cartel. When that Act was repealed in 1981, LIHEAA was adopted in its place in order to devolve certain welfare funding decisions back to the states in the form of block-grant programs. See Rodriguez v. Cuomo, 953 F.2d 33, 38 (2d Cir.1992). LIHEAA provides block grants to participating states to subsidize part of the costs of heating (or air conditioning) incurred by low-income families. This program is very general in its terms, leaving eligibility criteria, and other specifics, largely to the discretion of the states. See Id. at 41.
 
 
 4
 HEAP was created by the Department pursuant to a New York statute authorizing the development of a program for participation in LIHEAA. See N.Y.Soc.Serv.Law Sec. 97 (McKinney 1992). Exercising the discretion afforded by LIHEAA, New York has elected not to augment the federal subsidy with any state funds, and to provide no subsidy for home cooling.
 
 
 5
 This appeal requires us to revisit, in light of a recent "clarification" of the law promulgated by Congress, an issue we addressed previously in Rodriguez: whether the defendants violated federal statutory or constitutional law when they categorically denied HEAP subsidies to two groups of persons living in federally-subsidized housing--(1) those whose heating costs are included as an undifferentiated component in their rent; and (2) those who pay separately for home heating fuel.
 
 
 6
 Prior to 1989--that is, prior to the eligibility changes at issue in this lawsuit--all government-subsidized tenants who paid for all or part of their utility bills were eligible for a HEAP subsidy, and those who were not responsible for any utility payments were ineligible. The term "utility payments" includes gas and electricity, and therefore might include electric home heating, but does not (or does not necessarily) include other home heating fuels. Over time, as the federal funding under LIHEAA diminished, the Department took measures to target available funds more narrowly.
 
 
 7
 The Regulation. Hearings were held in 1988, and a new regulation was adopted for the 1989-90 HEAP plan year that automatically disqualifies from HEAP anyone who lives in government subsidized housing whose heat is included in rent. See 18 N.Y.Comp.Codes Rules & Regs. Sec. 393.4(c)(3)(i) (the "Regulation"). The Department's rationale in adopting this Regulation was that, because the rent paid by these individuals (including heat) is capped at thirty percent of their income, they are to that extent insulated from increased heating costs and have less need than others for HEAP assistance. We upheld this Regulation in Rodriguez. Plaintiffs Marbley and McClain live in a housing project in Albany. Their heating costs are included in their federally assisted rent. Their eligibility for HEAP subsidies was terminated by the Regulation.
 
 
 8
 The Policy. Beginning with the 1988-89 plan year, the Department adopted a policy reducing HEAP payments to tenants in federally-subsidized housing who pay their heating costs out-of-pocket, so that they would receive a HEAP subsidy equal to that paid to tenants of unsubsidized housing whose heat is included in their rent (the "Policy"). The Department's rationale in adopting the Policy was that most tenants of subsidized housing live in multiple-dwelling units and have lower heating costs than families living in detached, single-family housing. The Policy was rescinded after the 1992-93 HEAP plan year. Plaintiff Beauregard lives in federally assisted housing in Malone, in Franklin County. Her home is heated by oil for which she pays separately and in addition to her rent. Her HEAP subsidy is therefore unaffected by the Regulation. However, it was reduced by the Policy while the Policy was in effect.
 
 
 9
 The Utility Allowance. The rent paid by all three plaintiffs is reduced by a factor called a "utility allowance," so that rent together with out-of-pocket utility payments will be subject roughly to the thirty percent cap. The utility allowance is a fixed estimate that is not keyed to each tenant's actual expenditure for particular expenses. In ordinary parlance, the term "utility" would include gas and electric and would not include oil or coal. Plaintiffs Marbley and McClain argue, however, that their "utility" bills include some home heating expense because their electric bills reflect the cost of the electric blowers that conduct heat to or around their apartments. Plaintiffs deem this significant.
 
 
 10
 The Clarification. As part of the Housing and Community Development Act of 1992, Congress adopted a "Clarification on Utility Allowance." See Pub.L. No. 102-550, Title IX, Sec. 927, 106 Stat. 3885 (published as Historical and Statutory Note to 42 U.S.C. Sec. 8624) ("section 927"). Section 927 provided that tenants who "are responsible for making out-of-pocket payments for utility bills[,] and ... receive energy assistance through utility allowances [under certain federal programs] ... shall not have their eligibility or benefits under other programs designed to assist low-income people with increases in energy costs since 1978 (including but not limited to the Low Income Home Energy Assistance Program) reduced or eliminated." Sec. 927(a). Section 927 was amended during the pendency of this lawsuit to address LIHEAA specifically, as we discuss below.
 
 
 11
 Proceedings. The complaint, filed on March 25, 1993, alleged that the defendants were administering the HEAP in a manner that violated LIHEAA, section 927, and the Equal Protection Clause of the Fourteenth Amendment. The district court certified the plaintiff and defendant classes, and granted each side partial summary judgment:
 
 
 12
 (1) defendants were granted summary judgment
 
 
 13
 (a) on plaintiffs' claim that the Regulation violates LIHEAA;
 
 
 14
 (b) on plaintiffs' claim that HEAP violates section 927;
 
 
 15
 (c) on plaintiffs' claim that HEAP violates the equal protection rights of government-subsidized tenants whose heat is included in their rent; and
 
 
 16
 (d) on all claims for monetary relief for violations of section 927 in the 1992-93 program year, on the grounds of qualified immunity.
 
 
 17
 (2) plaintiffs were granted summary judgment in respect of their claim that the Policy, reducing HEAP benefits to government-subsidized tenants who pay separately for heat, violates section 927; plaintiffs' request for injunctive relief on this issue was, however, denied as moot, because the Policy had been rescinded.
 
 
 18
 The district court denied the parties' cross-motions in respect of plaintiffs' claim that the Policy violated the equal protection rights of affected tenants, and plaintiffs' claim for retrospective equitable relief on behalf of tenants whose subsidies had been reduced in the 1992-93 policy year on account of the Policy.
 
 
 19
 This order was substantially modified on July 6, 1994, when, on cross-motions for reconsideration under Fed.R.Civ.P. 60, the district court (1) held that the Eleventh Amendment barred the two claims that had survived the cross-motions for summary judgment, (2) ruled that the Eleventh Amendment also barred the declaratory relief granted to the plaintiffs in the previous order, (3) dismissed the complaint in its entirety, and (4) denied plaintiffs' application for attorney's fees. This appeal followed.
 
 Discussion
 
 20
 Three issues are presented on appeal: whether the Regulation violates LIHEAA, or section 927, or the Equal Protection Clause; whether the Eleventh Amendment bars relief to those tenants whose HEAP subsidies were temporarily reduced prior to the rescission of the Policy; and whether the district court erred in denying plaintiffs' application for attorney's fees.
 
 
 21
 A. The Regulation.
 
 
 22
 The applicable segment of the Department's Regulation states:
 
 
 23
 For purposes of the annual HEAP Plan, ... categorical and income tested households in the following living arrangements are ineligible to receive benefits under HEAP:
 
 
 24
 (i) tenants of government subsidized housing with heat included in their rent ...
 
 
 25
 18 N.Y.Comp.Codes, Rules & Regs. Sec. 393.4(c)(3)(i).
 
 
 26
 In Rodriguez, we expressly rejected the argument that the Regulation violates LIHEAA. However, plaintiffs invoke the wording and legislative history of section 927 to demonstrate that it was intended to overturn Rodriguez.
 
 
 27
 As originally adopted, section 927 made the following (self-described) "clarification":
 
 
 28
 (a) Eligibility.--Tenants who--
 
 
 29
 (1) are responsible for making out-of-pocket payments for utility bills; and
 
 
 30
 (2) receive energy assistance through utility allowances that include energy costs under programs identified in subsection (c);[1]
 
 
 31
 shall not have their eligibility or benefits under other programs designed to assist low-income people with increases in energy costs since 1978 (including but not limited to the Low-Income Home Energy Assistance Program) reduced or eliminated.
 
 
 32
 One year after this enactment, the impact of section 927 on LIHEAA was clarified. Subsection (a), quoted above, was amended to say that such tenants "shall not have their eligibility or benefits under other programs designed to assist low-income people with increases in energy costs since 1978 reduced or eliminated, except as provided in subsection (d)." (Emphasis added.) And a new subsection (d) was added to limit LIHEAA eligibility entitlement to tenants who, inter alia, are responsible for paying heating or cooling costs:
 
 
 33
 (d) Special Rule for Low-Income Home Energy Assistance Program.--For purposes of the Low-Income Home Energy Assistance Program, tenants described in subsection (a)(2) who are responsible for paying some or all heating or cooling costs shall not have their eligibility automatically denied. A State may consider the amount of the heating or cooling component of utility allowances received by tenants described in subsection (a)(2) when setting benefit levels under the Low-Income Home Energy Assistance Program. The size of any reduction in Low-Income Home Energy Assistance Program benefits must be reasonably related to the amount of the heating or cooling component of the utility allowance received and must ensure that the highest level of assistance will be furnished to those households with the lowest incomes and the highest energy costs in relation to income, taking into account family size, in compliance with section 2605(b)(5) of the Low Income Home Energy Assistance Act of 1981 (42 U.S.C. 8624(b)(5)) [subsec. (b)(5) of this section].
 
 
 34
 Pub.L. No. 103-185, Sec. 1, 107 Stat. 2244 (Dec. 14, 1993) (codified at note following 42 U.S.C. Sec. 8624) (emphasis added). Subsection (d) protects the eligibility of people who both receive utility allowances (i.e., "tenants described in subsection (a)(2)") and "who are responsible for paying some or all heating or cooling costs." As subsection (d) recognizes, a state may wish to consider the amount of any utility allowance in fixing a LIHEAA subsidy even for people who pay heating or cooling costs out-of-pocket; for example, it stands to reason that a person who pays large electric bills for air conditioning may already be receiving some subsidy for that cost in the electricity component of the utility allowance. But section 927 cannot be read to say that all persons who receive utility allowances are necessarily eligible for LIHEAA subsidies. In the case of Marbley and McClane, applicability of section 927 depends upon whether they are responsible for paying heating costs.
 
 
 35
 Marbley and McClane argue that they are "responsible for paying" heating costs even if all their expense for heating was embedded in their rent. If so, however, they would also be deemed "responsible for paying" for roof repairs, security, elevator maintenance, the painting of the common areas, and all the other things that rent buys. But it is the landlord who is "responsible" for arranging these things and "paying" for them, both in terms of contract obligation and the ordinary meaning of words. The plaintiffs' broad assumption of "responsibility" would render the statutory language meaningless. All tenants in New York State have heating needs. If Marbley and McClane--whose rent includes all their heat--are deemed to be "responsible for paying" their heating costs, who isn't? Yet, unless there is a tenant population that has no responsibility for paying for heat, the limiting language of section 927(d) has no limiting effect. Such a reading would be contrary to the "presumption against construing a statute as containing superfluous or meaningless words or giving it a construction that would render it ineffective." United States v. Blasius, 397 F.2d 203, 207 n. 9 (2d Cir.1968), cert. granted, 393 U.S. 950, 89 S.Ct. 375, 21 L.Ed.2d 361 (1968), and cert. dismissed, 393 U.S. 1008, 89 S.Ct. 615, 21 L.Ed.2d 557 (1969); see also United States v. Plaza Health Laboratories, Inc., 3 F.3d 643, 646 (2d Cir.1993) ("It is elemental that congress does not add unnecessary words to statutes."), cert. denied, --- U.S. ----, 114 S.Ct. 2764, 129 L.Ed.2d 878 (1994); Butts v. City of New York Dep't of Hous. Preservation & Dev., 990 F.2d 1397, 1408 (2d Cir.1993) ("it is the duty of reviewing courts to give effect to every clause and word of a statute where possible").
 
 
 36
 Next, Marbley and McClane argue that they are in fact responsible for some heating costs, and are (in this sense as well) within the population of people who pay "some or all heating costs". In this regard, they cite their out-of-pocket payments to the electric company for "the electricity necessary to operate warm air blower fixtures that distribute heat to their apartments." Plaintiffs' Brief at 6. We conclude that the clarification of section 927 is not concerned with that expenditure. Section 927 is designated a clarification and does not stand on its own; it can do no more than bring out features of what is already in the statute. We therefore read section 927 to require that no state automatically deny a LIHEAA subsidy to persons who buy some of the good that the statute subsidizes. LIHEAA subsidizes "home energy" and defines "home energy" as "a source of heating or cooling." 42 U.S.C. Sec. 8622(5). HEAP (which does not subsidize air conditioning) therefore subsidizes the generation of heat at its "source," not all things that promote warmth. Heating is achieved by insulation, for example, as well as by oil or coal or natural gas; but these fuels are sources of heating, and insulation is not. The "warm air blower fixtures" channel and direct heat, and they distribute it, but they are not the source of it.
 
 
 37
 By amendment, Congress can change eligibility criteria for LIHEAA programs, but the enactment of a clarification conveys no such intention, particularly since one express purpose of the block grant is to devolve onto the states the job of specifying eligibility. See Rodriguez, 953 F.2d at 38-39. Plaintiffs' reading of the clarification, which would create exquisite new eligibility classifications that are only indirectly related to what LIHEAA subsidizes, would amend rather than clarify.
 
 
 38
 We therefore understand the contested language in section 927(d) to mean that only those tenants who pay separately for the costs of fueling a "source of heating" are protected from automatic exclusion from HEAP. Tenants who do not pay separately for heat may be automatically excluded. Rodriguez so construes the statute, and section 927 offers no additional insight. We have no doubts in respect of this construction, and we therefore have no reason to look at sources beyond the statutory language. See Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1072-73 (2d Cir.1993).
 
 
 39
 Plaintiffs urge that we consider the remarks of a congressman involved in designing section 927, who read the clarification to "reaffirm[ ]" the view "that housing assistance programs are intended to supplement, not replace help that low-income people receive under energy assistance and other need-based programs." 138 Cong.Rec. H11465-01, H11471 (daily ed. October 5, 1992) (statement of Rep. Waters). Defendants point to an exchange of correspondence between other congressmen suggesting that the amendment to the clarification reflects the view that, "where the individual pays none of the heating bill, it seemed unnecessary for them to get this [LIHEAA] assistance." 139 Cong.Rec. H9616-02, H9617 (daily ed. Nov. 15, 1993) (statement of Rep. Frank). None of this is illuminating. See Bath Iron Works Corp. v. Director, Office of Workers' Compensation Programs, --- U.S. ----, ----, 113 S.Ct. 692, 700, 121 L.Ed.2d 619 (1993) ("we give no weight to a single reference by a single Senator during floor debate in the Senate"); Butts, 990 F.2d at 1405 ("The Supreme Court ... has noted that the 'contemporaneous remarks of a sponsor of legislation are certainly not controlling in analyzing legislative history.' ") (citing Weinberger v. Rossi, 456 U.S. 25, 35 n. 15, 102 S.Ct. 1510, 1517 n. 15, 71 L.Ed.2d 715 (1982)). In any event, " '[o]ur task is to give effect to the will of Congress, and where its will has been expressed in reasonably plain terms, that language must ordinarily be regarded as conclusive.' " Negonsott v. Samuels, --- U.S. ----, ---- - ----, 113 S.Ct. 1119, 1122-23, 122 L.Ed.2d 457 (1993) (quoting Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 570, 102 S.Ct. 3245, 3249, 73 L.Ed.2d 973 (1982)). Congress may amend the statute or clarify it, but we are not open to persuasion by the "legislative history" of a clarification or an amendment to a clarification.
 
 
 40
 Plaintiffs' equal protection challenge to the Regulation is meritless. The Regulation does not use a suspect classification, nor does it impair a fundamental right. Therefore, it must be upheld if the classification it adopts is rationally related to the achievement of a legitimate governmental purpose. See City of Dallas v. Stanglin, 490 U.S. 19, 26, 109 S.Ct. 1591, 1595, 104 L.Ed.2d 18 (1989). Although we did not directly address the equal protection issue in Rodriguez, we unambiguously concluded that the classifications inherent in the Regulation were rationally related to a legitimate government function: "[a] state may rationally conclude that tenants occupying government subsidized housing with heat included in their rent are less in need of HEAP funds than, for example, tenants who do not live in such housing." Rodriguez, 953 F.2d at 41. This is so because "plaintiffs' heating costs represent a fixed percentage of their income, and are already substantially subsidized. Unlike tenants living in non-government-subsidized-housing, plaintiffs' rent cannot go up in response to a rise in their landlord's heating costs...." Id. Nothing has changed in the three years since that decision was handed down.
 
 
 41
 We therefore conclude that the Regulation does not violate any provision in LIHEAA, even as clarified by section 927, nor does it violate the Constitution.B. Injunctive Relief and the Eleventh Amendment.
 
 
 42
 As previously noted, the plaintiff class actually consists of two discrete groups. The first group (whose claim is addressed in section A, above) are tenants who pay rent that includes the costs of heating, and who are therefore automatically excluded from receiving a HEAP subsidy. The second group, represented by named plaintiff Beauregard, pay separately for heat, but--because they live in government-subsidized housing--suffered an automatic reduction in their HEAP subsidy. After the 1993 rescission of the Policy that caused this reduction, the only live claim of these plaintiffs is in respect of the subsidy reduction for HEAP plan year 1992-93.[2] They argue on appeal that the district court erred in denying them an injunction that would require the state to appropriate funds from another HEAP plan year to compensate them for the difference between what they received in 1992-93 and what they would have received but for the reduction.
 
 
 43
 Although the district court originally decided that declaratory relief was appropriate in respect of the 1992-93 plan year, the court withdrew that ruling on reconsideration. Relying on Green v. Mansour, 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985) and Jones v. Smith, 784 F.2d 149 (2d Cir.1986), the court ultimately concluded that, because any violation of plaintiffs' rights under section 927 had been corrected when the state rescinded the policy, the Eleventh Amendment barred a declaratory judgment. We agree.
 
 
 44
 The plaintiffs in Green brought two separate class actions alleging that the Commissioner of the Michigan Department of Social Services violated federal law in calculating their benefits under the Aid to Families of Dependent Children ("AFDC") program. Sometime before a final determination on the merits could be issued, Congress amended the AFDC statute, and in so doing made clear that the Commissioner was violating federal law. In response, the state altered its calculation of AFDC benefits to conform with federal law. Plaintiffs pursued their claims, insisting on a right either to "notice relief" or to a declaratory judgement. The district court dismissed these claims, and the Sixth Circuit affirmed. On certiorari, the Supreme Court affirmed on the ground that the Eleventh Amendment bars a retrospective declaration of a violation of federal law where there is no continuing violation to enjoin. See Green, 474 U.S. at 73, 106 S.Ct. at 428; see also Eng v. Coughlin, 858 F.2d 889, 896-97 (2d Cir.1988) ("Suits brought to end a continuing constitutional violation are permitted, while those seeking compensation for past injuries are prohibited under the [Eleventh] Amendment."). Eleventh Amendment immunity is particularly appropriate where a clarification of federal law assures that there can "be [no] threat of state officials violating the [changed] law in the future." Green, 474 U.S. at 73, 106 S.Ct. at 428.
 
 
 45
 Green is directly on point. After dismissal of Beauregard's claims for prospective relief as moot, there was nothing left of her case but a claim for retrospective declaratory judgment and an injunction. Green forbids such a declaration, and there is therefore no reason to entertain Beauregard's claim for injunctive relief. See also Edelman v. Jordan, 415 U.S. 651, 666-69, 94 S.Ct. 1347, 1357-58, 39 L.Ed.2d 662 (1974) (barring award of retroactive benefits under 11th Amendment). As the Supreme Court concluded in Green, the proper recourse is through the state's administrative procedures. See 474 U.S. at 70, 106 S.Ct. at 426.
 
 
 46
 Plaintiffs argue that our decision in Holley v. Lavine, 605 F.2d 638 (2d Cir.1979), draws a distinction between state and county social services commissioners, and requires the conclusion that the county defendants in this case are not protected by the Eleventh Amendment. We disagree. The plaintiff in Holley was suing to obtain retroactive relief under the AFDC program, which in New York at the time was funded 25 percent by the county, 25 percent by the state, and 50 percent by the federal government. We afforded "great[ ] significance [to the fact that] the entity upon whom rests the primary obligation to make payments to the AFDC recipient ... appears to be the County." Holley, 605 F.2d at 644. Under the implementing state statute, social services districts were "required by law to provide for the 'assistance and care of any person ... who is in need of public assistance and care which he is unable to provide for himself.' " Id. at 643 (quoting N.Y.Soc.Serv.L. Sec. 62(1)). "Moreover, 'the county's duty to provide assistance is not dependent upon the receipt of equivalent money from the State and the cases have so held.' " Id. at 644 (quoting Jones v. Berman, 37 N.Y.2d 42, 55, 371 N.Y.S.2d 422, 332 N.E.2d 303 (1975)).
 
 
 47
 In Holley, the county defendants bore "ultimate responsibility for public assistance payments," 605 F.2d at 644, and were therefore not protected by the Eleventh Amendment. Under HEAP, however, the county commissioners do not bear the primary obligation to make the payments. The county social services districts are only required to "participate in the federal low-income home energy assistance program and ... assist eligible households found in such districts to obtain low-income home energy assistance." N.Y.Soc.Serv.L. Sec. 97(2). Thus the only responsibility of the county defendants in this case is to process paperwork and parcel out funds from the state treasury. The HEAP statute contemplates that the county social services districts will not be responsible for HEAP expenditures: any such expenditures are "subject to one hundred percent reimbursement by the state, if and for so long as federal funds are available for the full amount of such expenditures." N.Y.Soc.Serv.Law Sec. 97(4). Moreover, the HEAP program only operates to the extent that federal funds are available: "No person ... shall be certified as eligible for and entitled to receive [benefits] ... if no federal funds are available for such purpose." Id. at Sec. 97(2). Given the counties' lack of policymaking discretion and the liability of the state for all county expenditures, the county defendants act as arms of the state in administering HEAP, and are therefore entitled to the same protection that the Eleventh Amendment affords to the state. See Hess v. Port Auth. Trans-Hudson Corp., --- U.S. ----, ----, 115 S.Ct. 394, 404, 130 L.Ed.2d 245 (1994) (noting that "the vulnerability of the State's purse [is] the most salient" factor in arm-of-the-state analysis).
 
 C. Attorney's Fees
 
 48
 The Policy automatically reducing HEAP payments to government-subsidized tenants who pay separately for heat was rescinded three days after plaintiffs filed their motion for summary judgment. Plaintiffs characterize this litigation as the "catalyst" for the policy change, claim that they thereby "partially prevailed," and on that basis seek attorney's fees under 42 U.S.C. Sec. 1988. This victory claim may entail some post hoc reasoning, but it is not on its face implausible. (While the catalyst claim is solely in respect of the argument advanced by Beauregard, the district court did not create subclasses; the attorney's fee claim is therefore advanced by the plaintiffs as a class, rather than by Beauregard alone.)
 
 
 49
 Congress has deemed litigation to be a worthwhile tool in protecting and vindicating important federal rights. This is the general rationale underlying section 1988, which allows courts to award attorney's fees to a successful plaintiff pursuing federal claims under 42 U.S.C. Sec. 1983. See Hensley v. Eckerhart, 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40 (1983). Reimbursement of legal fees and expenses is an incentive for lawyers to accept these often time-consuming cases; limiting that recovery to "prevailing parties" tends to filter out meritless cases.
 
 
 50
 Plaintiffs argue, and we agree, that an award of attorney's fees under section 1988 may be warranted where the litigation leads to a favorable result, even if the case does not culminate in a final judgment:
 
 
 51
 A lawsuit sometimes produces voluntary action by the defendant that affords the plaintiff all or some of the relief he sought through a judgment--e.g., a monetary settlement or a change in the conduct that redresses the plaintiff's grievances. When that occurs, the plaintiff is deemed to have prevailed despite the absence of a formal judgment in his favor.
 
 
 52
 Hewitt v. Helms, 482 U.S. 755, 760-61, 107 S.Ct. 2672, 2675-76, 96 L.Ed.2d 654 (1987). In Helms, the Supreme Court refused to "decide the circumstances, if any, under which this 'catalyst' theory could justify a fee award under Sec. 1988...." Id. at 763, 107 S.Ct. at 2677. Defendants rely on Farrar v. Hobby, --- U.S. ----, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992), for the proposition that a litigant cannot "prevail" entirely by catalysis. In Farrar, the Supreme Court said that "to qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim. The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought, or comparable relief through a consent decree or settlement." Id. at ----, 113 S.Ct. at 573 (citations omitted). That language, however, appears in the segment of the opinion that discusses the particular award in that case: a jury verdict resulting in a final judgment of nominal damages. Earlier in the opinion, the Court noted its " 'generous formulation' " under which " 'plaintiffs may be considered "prevailing parties" for attorney's fees purposes if they succeed on any significant issue in litigation which obtains some of the benefit the parties sought in bringing suit.' " Id. at ----, 113 S.Ct. at 572 (citation omitted). Consistent with this principle, most courts have--either expressly or implicitly--affirmed the continued viability of the "catalyst" theory of recovery of attorney's fees. See Kilgour v. City of Pasadena, 53 F.3d 1007, 1009 (9th Cir.1995); Baumgartner v. Harrisburg Hous. Auth., 21 F.3d 541, 550 (3d Cir.1994); Zinn by Blankenship v. Shalala, 35 F.3d 273, 276 (7th Cir.1994); Little Rock School Dist. v. Pulaski County Special School Dist. 1, 17 F.3d 260, 263 n. 2 (8th Cir.1994); Craig v. Gregg County, Tex., 988 F.2d 18, 20-21 (5th Cir.1993); American Council of the Blind of Colo., Inc. v. Romer, 992 F.2d 249, 251 (10th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 184, 126 L.Ed.2d 143 (1993); see also Rodonich v. Housewreckers Union Local 95, 52 F.3d 28, 33 (2d Cir.1995); Paris v. U.S. Dep't of Hous. & Urban Dev., 988 F.2d 236, 238 (1st Cir.1993); Citizens Against Tax Waste v. Westerville City Sch. Dist. Bd. of Educ., 985 F.2d 255, 257-58 (6th Cir.1993); but see S-1 and S-2 v. State Bd. of Educ. of N.C., 21 F.3d 49, 51 (4th Cir.) (en banc), cert. denied, --- U.S. ----, 115 S.Ct. 205, 130 L.Ed.2d 135 (1994).
 
 
 53
 We now expressly state what was implicit in our opinion in Rodonich: Farrar does not eviscerate the long-standing doctrine that a plaintiff who has obtained at least some part of what he sought in bringing the suit may be considered a prevailing party and may therefore seek an award of attorney's fees. Securing an enforceable decree or agreement may evidence prevailing party status, but the judgment or agreement simply embodies and enforces what is sought in bringing the lawsuit: "[a]t the end of the rainbow lies not a judgment, but some action (or cessation of action) by the defendant that the judgment produces--the payment of damages, or some specific performance, or the termination of some conduct." Helms, 482 U.S. at 761, 107 S.Ct. at 2676. Victory can be achieved well short of a final judgment (or its equivalent): "if the defendant, under pressure of the lawsuit, alters his conduct (or threatened conduct) towards the plaintiff that was the basis for the suit, the plaintiff will have prevailed." Id.
 
 
 54
 It cannot be said that a plaintiff is a prevailing party entitled to attorney's fees whenever a defendant changes its conduct "under pressure of the lawsuit." For the plaintiff to be considered a prevailing party, there must be a causal connection; that is, the lawsuit must be " 'a catalytic, necessary, or substantial factor in attaining the relief.' " Koster v. Perales, 903 F.2d 131, 135 (2d Cir.1990) (quoting Gerena-Valentin v. Koch, 739 F.2d 755, 758-59 (2d Cir.1984)) (further citations omitted). A government's change of policy or position may coincide with the interests or desires of persons who seek to promote change by litigation, without evidencing a causal connection. Certainly, governments may change a policy without paying a toll or tribute to persons who advocated that policy change in court. However, a plaintiff whose lawsuit has been the catalyst in bringing about a goal sought in litigation, by threat of victory (and not by dint of nuisance and threat of expense), has prevailed for purposes of an attorney's fee claim, even though the result has not been reduced to a judgment, consent decree, or settlement.
 
 
 55
 Other courts have formulated tests for recovery of attorney's fees. The Tenth Circuit requires a causal link between the lawsuit and the result as well as a demonstration "that the defendant's conduct in response to the lawsuit was required by law." Powder River Basin Resource Council v. Babbitt, 54 F.3d 1477, 1486 (10th Cir.1995). In our view, this latter requirement is unnecessary and may defeat some meritorious claims for attorney's fees. In the exercise of its discretion, the district court will doubtless consider the strength of a claim in gauging its catalytic effect, but the district court is not required to resolve the merits of the lawsuit in order to decide an application for attorney's fees.
 
 
 56
 The Seventh Circuit requires (as its second prong) "that the defendant must not have acted wholly gratuitiously, i.e. the plaintiffs' claims, if pressed, cannot have been frivolous, unreasonable, or groundless." Johnson v. Lafayette Fire Fighters Ass'n Local 472, 51 F.3d 726, 729 (7th Cir.1995) (citations and internal quotations omitted). We agree that nuisance claims and strike suits do not justify attorney's fees, although we consider that this concept is an aspect of causation. Implicit in the "catalyst" theory of attorney's fees is the notion that, had the litigation proceeded to a final judgment, judgment could have been for the plaintiff and that this prospect brought about a result the plaintiff sought.
 
 
 57
 In this case, the only success the plaintiffs can claim is the State's rescission of its Policy automatically reducing HEAP subsidies to the Beauregard group of plaintiffs. In rejecting the application, the district court relied upon the principle that, where a legal immunity bars a claim, "Sec. 1988 does not authorize a fee award against that defendant," Farrar, --- U.S. at ----, 113 S.Ct. at 572. Because the district court--upon reconsideration--dismissed the declaratory judgment (and all other claims of this group) on Eleventh Amendment grounds, the court concluded that Farrar barred any fee award in this case. We disagree.
 
 
 58
 The record reflects that the Policy was changed a few days after plaintiffs filed their motion for summary judgment. As discussed above in section B, it was that change in the Policy that, under Green v. Mansour, 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371 barred a subsequent declaratory judgment or injunction, and left plaintiff with no claim that could withstand challenge under the Eleventh Amendment. The district court concluded that the Eleventh Amendment precluded Beauregard's status as a prevailing party, but did not consider that the Eleventh Amendment bar was triggered by a policy change that may in turn have been triggered by this litigation. No one contends that Beauregard's claims were all barred from inception; the Eleventh Amendment problem that now bars relief did not exist at the commencement of the suit. Therefore, the issue is whether Beauregard's litigation of her claims was a legally sufficient cause of the change in the Policy. If so, she has prevailed on that particular claim.
 
 
 59
 If the district court determines that the plaintiffs prevailed, then the court will--subject to its discretion--determine what award, if any, would constitute reasonable attorney's fees. As Farrar teaches, not every litigation success justifies a departure from the American rule. Although the plaintiff may have achieved some alteration in the legal landscape, " 'the degree of the plaintiff's overall success goes to the reasonableness' of a fee award." Farrar, --- U.S. at ----, 113 S.Ct. at 574 (quoting Texas State Teachers Ass'n v. Garland Independent Sch. Dist., 489 U.S. 782, 793, 109 S.Ct. 1486, 1494, 103 L.Ed.2d 866 (1989)).
 
 Conclusion
 
 60
 We affirm the district court's dismissal of plaintiffs' claims, except that we vacate and remand for a determination of whether the litigation was a legally sufficient cause of the change in the Policy and--if so--the amount, if any, of reasonable attorney's fees. We have considered all other arguments raised on appeal and find them to be without merit.
 
 
 
 [1]
 It is not disputed that the plaintiffs receive energy assistance through programs described in subsection (c), and therefore are covered by this clarification
 
 
 [2]
 Although the Policy had been in effect since 1988, plaintiffs' claim is based upon the adoption of section 927, which occurred in October 1992. Since the Policy was rescinded after the 1992-93 plan year, plaintiffs' limit their claim to their alleged loss during that year